# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

**TRENTON X. ADKINS,**

     **Plaintiff,**

**vs.**                                **CIVIL ACTION NO. 3:17-CV-01927**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Child's Disability Benefits (CDB) on both his parent's earning records under Title II, and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered March 21, 2017 (Document No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the Plaintiff's Brief in Support of Judgment on the Pleadings and the Defendant's Brief in Support of Defendant's Decision. (Document Nos. 9 and 10.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (Document No. 9.), **DENY** Defendant's request to affirm the decision of the Commissioner (Document No. 10.); **REVERSE** the final decision of the

Commissioner; and **REMAND** this matter back to the Commissioner for further administrative proceedings.

**Procedural History**

The Plaintiff, Trenton Xavier Adkins (hereinafter referred to as "Claimant"), filed his applications for Child's Disability Benefits and Title XVI benefits on August 8, 2013, and another application for Child's Disability Benefits on September 19, 2013, alleging disability from March 6, 2011 due to Stage 3 Hodgkin's lymphoma.[1] (Tr. at 281-288, 303, 325.) His claims were initially denied on December 3, 2013 (Tr. at 154-168.) and again upon reconsideration on April 16, 2014. (Tr. at 177-197.) Thereafter, Claimant filed a written request for hearing on April 24, 2014. (Tr. at 198-200.) An administrative hearing was held on February 4, 2015 before the Honorable Chris L. Gavras, Administrative Law Judge ("ALJ"). (Tr. at 26-72.) At the hearing, Claimant amended his alleged onset date to March 1, 2011 and alleged a closed period of disability through March 1, 2013. (Tr. at 44.) On March 19, 2015, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 8-25.) On May 21, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 7, 379-382.) The ALJ's decision became the final decision of the Commissioner on January 26, 2017 when the Appeals Council denied Claimant's Request. (Tr. at 1-6.)

On March 17, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 6 and 7.)

---

[1] Claimant submitted a Disability Report on September 19, 2013 alleging that in addition to Hodgkin's lymphoma in remission, he suffered from other medical conditions: "severe muscle spasms; OCD; ADHD; narcolepsy; agoraphobia; depression; and neuropathy." (Tr. at 330.)

Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 9.); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 10.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was born on January 14, 1992 and considered a "younger person" by the Regulations throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 35-36.) He turned eighteen before the alleged onset date of March 6, 2011, the date he was diagnosed with cancer. (Id.) Claimant has a GED and at the time of the hearing, entered his junior year in college, working towards a Bachelor's degree in computer science. (Tr. at 36-37.) Claimant had no past relevant work at the substantial gainful activity level during the relevant time period, though he had an unsuccessful attempt to return to work and school in the fall of 2012. (Tr. at 37-38.) Fortunately, since March 2013, Claimant's Hodgkin's lymphoma remained in remission, allowing him to work and attend to his studies at Marshall University. (Tr. at 42.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Administration ("SSA") provides for the payment of disabled child's insurance benefits if the claimant is eighteen years old or older and has a disability that began before attaining age twenty-two. 20 C.F.R. § 404.350(a)(5). The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520,

416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. <u>Id</u>. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. <u>Id</u>. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. <u>Id</u>. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. <u>Id</u>. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. <u>Id</u>. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. <u>Id</u>. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. <u>Id</u>. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." <u>Id</u>. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the

impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those

sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" in the first three functional areas (activities

of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless

evidence indicates more than minimal limitation in the claimant's ability to do basic work

activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant had not attained age 22 as of March 1, 2011, the amended alleged onset date. (Tr. at 13, Finding No. 1.) The ALJ next

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since March 1, 2011 through March 1, 2013. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following medically determinable impairments: Hodgkin's lymphoma and associated myalgia; depression; and anxiety. (Id., Finding No. 3.) The ALJ concluded Claimant's impairments did not significantly limit (or expected to significantly limit) his ability to perform basic work-related activities for 12 consecutive months, and therefore did not satisfy the duration requirement under the Regulations. (Tr. at 14, Finding No. 4.) Finally, the ALJ determined Claimant had not been under a disability from March 1, 2011 to March 1, 2013. (Tr. at 19, Finding No. 5.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that when he was 19 years old, he was diagnosed with Hodgkin's lymphoma, underwent chemotherapy and radiation treatment for a closed period of two years before he felt well enough to return to school and work. (Document No. 9 at 5.) Claimant argues that his credible testimony concerning the effects of the cancer treatment, which included chronic fatigue and pain, nausea, poor sleep, shortness of breath, post-chemo cognitive impairment and other maladies was consistent with the medical records. (Id. at 6-8.) In addition to his other severe impairments of depression and anxiety, the evidence satisfied the twelve month duration period, because it lasted the closed period of March 1, 2011 to March 1, 2013. (Id. at 8.) Claimant contends that the ALJ's finding otherwise is not supported by substantial evidence. (Id.)

Claimant also asserts that the ALJ erred by finding he was capable of substantial gainful activity when he ignored the vocational expert's testimony that Claimant's fatigue due to his cancer treatments during the closed period would foreclose employment if he were off task 20%

during the workday or if Claimant missed more than one day of work every other month. (Id. at 9.) In addition, Claimant contends that the ALJ erred when he stated Claimant's activities of daily living did not suggest any resulting vocational limitations lasting more than twelve consecutive months during the closed period. (Id.)

Claimant asks the Court to award him childhood disability benefits and supplemental security income benefits, or in the alternative, to remand this matter for a rehearing. (Id.)

In response, the Commissioner argues that the ALJ correctly found that Claimant had no impairment or combination of impairments that significantly limited his ability to perform basic work activities for a continuous period of no less than twelve months, therefore, Claimant did not have a severe impairment and was not disabled at step two of the sequential evaluation process. (Document No. 10 at 4-5.) Claimant's subjective complaints were properly deemed not entirely credible, because they were not supported by the objective medical evidence, further, all four State agency physicians opined that the record indicated Claimant had no severe impairment or combination thereof. (Id. at 5.)

In addition, the Commissioner points out that Claimant's treating oncologist opined that Claimant's subjective complaints of pain and fatigue were inconsistent with the objective findings because his lymphoma was in remission. (Id. at 6.) His treating oncologist opined further that Claimant had no impairments that would limit his ability to work, although the Commissioner admits that the opinion was dated after the relevant closed period and did not indicate a specific period of time as a reference point. (Id.) Moreover, the treating oncologist's treatment notes directly undermine Claimant's allegations of totally disabling limitations. (Id. at 6-8.)

Because the ALJ found Claimant was not disabled at step two of the sequential evaluation

process, he did not have to proceed to the next steps, therefore, he was not obligated to entertain the vocational expert's testimony. (Id. at 8-9.) Further, an ALJ need only pose hypothetical questions to a vocational expert that include credibly established limitations, and there were none here. (Id. at 9.)

The Commissioner states the ALJ's decision is supported by the substantial evidence and asks this Court to affirm it. (Id. at 9-10.)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Treatment for Hodgkin's Lymphoma:

On April 11, 2011, Dr. Govardhanan Nagaiah noted Claimant stated he had tolerated chemotherapy quite well; he was in no acute distress, had no significant findings, and had good energy. (Tr. at 425-426.) Claimant's only reported concern at the time was that "he seems to have difficulty in keeping his memory." (Tr. at 425.)

On August 1, 2011, a PET scan showed the tumor was stable and bone marrow showed increased activity. (Tr. at 538.) On August 18, 2011, Dr. Gerrit Kimmey, Claimant's treating oncologist, noted that Claimant has had "a reasonably good two weeks" and was in remission. (Tr. at 675.) He had one final chemotherapy cycle upcoming, and although he had mild complaints of some nausea and vomiting from treatment, and a few aches and pains from medications, he was in no acute distress, and physical examination showed no abnormal findings. (Id.) On August 25, 2011, Dr. Sanjeev Sharma noted Claimant "presents today doing well. He really denies any

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

specific complaints other than aches in his joints." (Tr. at 415.) Dr. Sharma noted Claimant appeared well nourished, healthy, very pleasant, and in no acute distress, although Claimant expressed some anxiety about upcoming radiation treatment; a workup was negative. (Tr. at 416.)

On September 8, 2011, Dr. Sharma noted that Claimant had been in the emergency room, and that he "has had a lot of different, unusual symptoms, pains in the feet, legs, arms, and chest. Workup was essentially negative. He does have some anxiety. The plan is to go ahead and proceed with the radiation and repeat a PET scan a couple of months after radiation therapy." (Tr. at 417.) On September 29, 2011, Dr. Kimmey noted Claimant reported fatigue, musculoskeletal pain, difficulty sleeping, and anxiety, otherwise, the physical examination was normal; it was noted that Claimant had taken Xanax and Lortab with some relief. (Tr. at 677.) Dr. Kimmey noted that Claimant had "a good deal of anxiety" and was considering seeing a psychiatrist. (Id.) Dr. Kimmey further noted, "I am not sure why he is having all of these aches and pains. We will check his electrolytes. We will go over his magnesium[.]" (Id.)

On October 12, 2011, Dr. Sharma noted Claimant was doing well, had no trouble swallowing, and just mild skin erythema. (Tr. at 418.)

On November 21, 2011, Dr. Sharma again noted Claimant was doing well and that he had no complaints, no B symptoms. (Tr. at 419.) On November 30, 2011, Claimant had a physical examination by Dr. Kinney that showed no findings; Claimant complained of aches and pain in his legs that improved with exercise. (Tr. at 683.) By December 15, 2011, Claimant complained of "severe pain" in his thoracic spine causing him shortness of breath, although thoracic spine and chest x-rays were normal and an MRI was negative. (Tr. at 685-688, 689, 692, 694.)

On January 16, 2012, Claimant returned to Dr. Kimmey reporting that other than having

muscle spasms, he did not have any unusual problems; it was noted that Claimant was in no acute distress and a physical examination was unremarkable. (Tr. at 689.) His back pain was "better overall." (Tr. at 690.) On February 27, 2012 and April 30, 2012, Dr. Kimmey noted Claimant's Hodgkin's disease was still in remission. (Tr. at 692, 694.)

During a work-in visit on June 13, 2012, Claimant reported to Dr. Kimmey that he had more chest pain, his feet hurt less, but his legs hurt more; the chest pain was of concern, and Dr. Kimmey ordered a PET scan. (Tr. at 703.) On July 23, 2012, Dr. Kimmey noted the June 19, 2012 PET scan was negative. (Tr. at 705.) Claimant complained only of occasional muscle spasms that were not as severe and doing better. (Id.) He reported that he lost weight because he had been more active and getting more exercise and running; he stated that he "really feels well" and had no complaints. (Id.) There were no negative findings on physical examination. (Id.)

On August 20, 2012, Dr. Michael Craig noted Claimant reported no new problems, he had a good appetite, was sleeping well, had only occasional tiredness, continued to have muscle spasms daily all over his body, but he denied chest pain and shortness of breath. (Tr. at 446.) On October 10, 2012, Claimant returned to Dr. Kimmey complaining about abnormalities on his right foot; Dr. Kimmey referred him to a podiatrist. (Tr. at 710-711.) On November 5, 2012, podiatrist Janet Baatile examined Claimant for his severe foot cramps throughout the day while working at Best Buy and being on his feet all day long. (Tr. at 712.) Dr. Baatile observed Claimant had full 5/5 strength "in all prime movers". (Tr. at 713.) She determined that Claimant had a dorsal cyst on his right foot and a plantar fibroma on his left foot. (Id.) She prescribed medications to shrink these growths, and orthotic inserts to help provide arch support. (Id.)

On November 19, 2012, Claimant returned to see Dr. Kimmey and reported that the

treatment for his feet was "working pretty well" and his symptoms were improving. (Tr. at 716.) It was noted that Claimant was diagnosed with sleep apnea after a sleep study; he had complained of fatigue because he was not getting any RM sleep at night, that he would have further testing. (Id.) A physical examination was negative. (Tr. at 716-717.)

On January 21, 2013, Claimant had another return visit to Dr. Kimmey and reported that he was feeling much better after getting over the flu, and was exercising and eating better. (Tr. at 719, 721.) On January 28, 2013, Dr. Scott Davis confirmed Claimant's condition was still in remission, and that he was doing well; Dr. Davis noted Claimant was in no acute distress, and physical examination was fully normal. (Tr. at 467.)

State Agency Medical Consultants:

At the initial level of review, on October 26, 2013, Dominic Gaziano, M.D. reviewed the evidence of record and found that Claimant's medically determinable impairments were not severe. (Tr. at 83, 92, 101.) On November 26, 2013, Ann Logan, Ph.D. reviewed the evidence of record and found that Claimant's medically determinable impairments were non severe. (Tr. at 82, 91, 100.)

At the reconsideration level, on April 15, 2014, Fulvio Franyutti, M.D. reviewed the evidence of record and affirmed Dr. Gaziano's assessment. (Tr. at 113, 123, 133.) On April 16, 2014, Paula J. Bickham, Ph.D. reviewed the evidence of record and affirmed Dr. Logan's assessment as written. (Tr. at 112, 122, 132.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that on or about March 2011, he believed he was dying, he could not sleep or eat, and he was in constant pain. (Tr. at 46.) He had a tumor blocking his esophagus, and pressing up against his heart and lungs; he underwent chemotherapy treatments from March 6, 2011 to the end of July or August, doing twelve treatments every other week. (Tr. at 46-47.) For a month thereafter, and concluding sometime in September or October 2011, he had twenty or thirty rounds of radiation treatment. (Tr. at 47.) The side effects from the chemotherapy was immediate, making Claimant vomit and causing him fatigue, memory loss, especially short term which he stated he still experienced. (Tr. at 48.) Claimant testified that these side effects lasted from a day to two weeks. (Id.) He also had injections to boost his blood cell count, which caused intense bone pain for a week as well. (Id.)

Claimant stated that he had mental difficulties prior to his cancer diagnosis, specifically, OCD, ADHD, and PTSD, however, those conditions were "very intensified" during his radiation treatments. (Tr. at 48, 53.) Claimant explained that although his treatment providers indicated that he was "doing well" in the fall of 2011, it was because he was doing better than others undergoing similar treatment because Dr. Kimmey did not release him back to work until the summer of 2012. (Tr. at 54-55.) Claimant admitted that he was more active around July 2012, running and exercising, however, it intensified his muscle spasms and pain so he had to stop for a few months. (Tr. at 56.) Claimant testified that the summer of 2012 was the first time he really started to feel good, but it did not last. (Tr. at 57.)

When Dr. Kimmey released him to return to work and school, he felt "fresh" initially, but would get fatigued within two hours of working. (Tr. at 49.) He was only working about six hours, but when school started, his fatigue worsened. (Id.) He had to quit working in the fall of 2012

because he had undiagnosed chronic fatigue, post-cognitive chemo impairment, and general fatigue. (Tr. at 38.) Claimant's physician did not want him to resume his ADHD medication until his "chemo brain" "slacked off", but when Claimant resumed his stimulant medication for his ADHD in 2013, it helped him stay awake to have a "regular workday". (Tr. at 49, 50.) However, up until March 2013, Claimant testified that the fatigue he experienced "would stop all cognitive thinking". (Tr. at 64.) At the time, he still was unable to enter "Stage 3 sleep"; Claimant testified that at that time, there was no way possible he could have sustained work due to the fatigue. (Tr. at 65.)

Claimant stated that he still occasionally gets muscle spasms throughout his body, pain in his extremities due to nerve damage from the cancer treatment, and neuropathy in his toes. (Tr. at 60.) Claimant was prescribed Neurontin for the pain, but he cannot take it because it makes him sleep all day. (Tr. at 61.) The cramping he experiences at times would prevent Claimant from standing or walking, and when it was slow at work, his boss would allow him to go to the break room to sit down. (Tr. at 61-62.)

Thomas Heiman, Vocational Expert ("VE") Testimony:

When asked a hypothetical question by the ALJ concerning an individual with Claimant's background, limited to the sedentary exertional level, but off task 20% of an eight hour workday due to fatigue in addition to regularly scheduled breaks, the VE answered that there would be no jobs for such an individual. (Tr. at 69-70.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

## Analysis

As previously stated, Claimant argues the ALJ improperly determined at step two that he did not have a severe impairment or combination of severe impairments that precluded him from performing basic work activity for a continuous period of twelve months or more.

Determining Severe Impairment:

A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." See 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Id. §§ 404.1521(a), 416.921(a). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs."

Id. §§ 404.1521(b), 416.921(b). The Regulations provide examples of these activities: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers and usual work situations; and (6) dealing with changes in a routine work setting. Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984). Additionally, Claimant had to prove that he had an impairment (or combination of impairments) that had more than a minimal effect on his ability to do basic work activities for a continuous period of no less than 12 months. 20 C.F.R. §§ 404.1505(a), 416.905(a); SSR 96-3, 1996 WL 374181. Claimant also bears the burden of establishing a disabling impairment. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (holding that the claimant bears the burden of proof and persuasion at steps one through four, stating "it is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so").

The ALJ determined that Claimant's impairments were not severe at step two based on the medical evidence of record, the opinion evidence, as well as on his analysis of Claimant's credibility, which the ALJ found Claimant's allegations were not entirely credible. (Tr. at 15.) Social Security Ruling 96-7p[4] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§

---

[4] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on March 19, 2015. See, SSR 16-3p, 2016 WL 1131509.

404.1529, 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In finding that Claimant did not satisfy his burden at step two in the sequential evaluation process, the ALJ acknowledged Claimant's statements and testimony during the closed period: that he reported nausea, body aches, and a low immune system due to chemotherapy treatment. (Tr. at 15.) The ALJ acknowledged that Claimant alleged he could not do chores, yard work, had difficulty lifting, walking, standing, sitting and performing postural tasks because of chronic fatigue and depression, that he could not concentrate, and that he testified about his fatigue, leg pain and muscle cramping during the closed period. (Id.) However, after performing the two step

process[5], the ALJ reviewed the aforementioned allegations and compared them with the objective medical evidence of record, noting that Claimant underwent aggressive treatment for Hodgkin's, and that he responded well to the treatment. (Id.)

With respect to Claimant's physical impairments, the ALJ began his review starting with Claimant's initial diagnosis of Hodgkin's lymphoma in March 2011 (Tr. at 15, 609.), proceeding with his chemotherapy treatment (Tr. at 15, 425, 582.), and continued to the tests and imaging of the mass in August 2011 that showed Claimant's disease had stabilized. (Tr. at 15, 531.) The ALJ noted additional therapy was recommended when a PET scan indicated some activity in the mass (Tr. at 15, 415-417.), but by October 2011, Claimant was doing well and feeling well after chemotherapy. (Tr. at 15, 418.) November 2011 records indicated Claimant's disease continued to be stable, although he had some anxiety issues "but those resolved with medication." (Tr. at 15.) The ALJ further noted that Claimant was permitted to do moderate exercise and mild resistance training. (Tr. at 15, 419.) December 2011 records again indicated the mass was stable and decreasing in activity. (Tr. at 15, 494.)

From January 2012 through March 2012, the ALJ noted that Claimant's medical records indicated that he complained of muscle spasms, but his physical examinations were otherwise normal. (Tr. at 15-16.) Treatment records showed that Claimant tolerated therapy well with no infection or nausea noted, and his Hodgkin's lymphoma showed no evidence of disease or increasing mass and that Claimant was to "continue activity as tolerated." (Tr. at 16, 436-440.) In May 2012, Claimant's condition remained stable. (Tr. at 16, 497.) By July 2012, the ALJ recognized that Claimant was exercising, his cancer was in remission, and that he felt well with no

---

[5] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

complaints. (Tr. at 16, 705.) Next, the ALJ noted that Claimant "continued to do well through the remainder of the requested closed period, with the exception of a brief flare up of foot cramps" that was treated with Neurontin and a cream, to which he responded well within two weeks. (Tr. at 16, 712, 716.) The ALJ acknowledged that again in August 2012, records indicated his disease remained stable (Tr. at 16, 446-449.), and by January 2013, the medical records showed that Claimant was "doing well" and that his physical findings were normal. (Tr. at 16, 467.)

Next, with regard to Claimant's mental health conditions, the ALJ found that though he received treatment during the relevant period, "his condition appeared to be stable on medication without any vocational limitations." (Tr. at 16.) The ALJ further recognized that the psychological consultative examination in November 2013 indicated that Claimant's mental status was "unremarkable at that time." (Id.) The ALJ gave the examiner's opinion "great weight", finding that it was consistent with the record, as Claimant reported doing well to his providers with few mental health symptoms, and that medication resolved any symptoms "quickly." (Tr. at 16, 419.) In short, the ALJ found that Claimant's mental impairment did not result in any vocational limitations lasting twelve or more consecutive months. (Tr. at 16.)

The ALJ summed up Claimant's treatment as having ended in late 2011, with records from November 2011, indicating that he had a good response to therapy; eight months after the beginning of the requested closed period, Claimant had no complaints. (Tr. at 17, 419.) The ALJ acknowledged that by January 2013, Claimant's complaints of spasms or neuropathy and fatigue were "episodic in nature", lasted less than six months, and did not last twelve or more months consecutively. (Tr. at 17, 467.) Moreover, the ALJ gave "great weight" to the opinion of Claimant's treating physician, Dr. Kimmey, who opined that he could engage in full time

employment because his Hodgkin's was in remission. (Tr. at 17.) Though the ALJ acknowledged that the treating source opinion was dated January 2015, the ALJ found "it relates back at least as far as the first notation of the claimant's remission in July 2012". (Id.)

Finally, the ALJ concluded that Claimant did not have any physical or mental impairment that significantly limited his ability to perform basic work activities as evidenced by the medical records, and that despite the aggressive treatment, Claimant had a good response, and it did not persist the required twelve or more consecutive months. (Id.) The ALJ further based this conclusion on the absence of complaints Claimant reported to his providers during the period, and that Claimant reported "going to class five days per week and was able to complete his activities of daily living (Exhibit 4E and Exhibit 14F)." (Tr. at 17, 317-324, 891-897.) The ALJ continued, noting that objective findings showed "mostly unremarkable physical exams", that Claimant's symptomology was episodic after treatment for Hodgkin's, that State agency physicians opined he had no severe impairments, and "his own treating physician noted that he did not have any functional limitations to at least the time period that he was noted to be in remission." (Tr. at 17-18.) The aforementioned resulted in the ALJ's finding that Claimant had no severe medically determinable impairments. (Tr. at 18.)

Claimant points out that the ALJ mentioned Claimant's activities of daily living as justification for his findings, and argues that his testimony corroborated with the medical evidence. (Document No. 9 at 8.) With respect to his activities of daily living, the undersigned notes that the ALJ references Claimant's statements made to the psychological consultative examiner in November 2013: that he went to class and the library five times per week, and that he was able to complete his activities of daily living. (Tr. at 16, 17, 18.) More notable is that these statements

were made *after* the closed period. The undersigned notes further that the ALJ not only referenced this consultative report, but also Claimant's Function Report dated March 28, 2011, which was the beginning of the closed period of alleged disability, in support of his finding that "he reported going to class five days per week and was able to complete his activities of daily living." (Tr. at 17.) Even a cursory review of that Function Report indicates that was simply not the case at that time.

Furthermore, in addition to the consultative examiner's report from November 2013, the ALJ referenced Claimant subsequent Function Report that was dated September 25, 2013 in support of his finding that Claimant had only mild limitations in the three of the four broad functional areas described in the Regulations for evaluating mental disorders. (Tr. at 18, 347-354.) Again, this Function Report contained Claimant's statements regarding his impairments *after* the closed period. In short, the statements Claimant made to the consultative examiner and in his SSA forms *after* the closed period have no relevance to his functioning during the closed period. Therefore, the ALJ's reliance on these statements in support of his finding that Claimant's functioning with respect to his activities of daily living did not comply with the Regulations or with Social Security Rulings, and is simply not "rational". <u>Oppenheim v. Finch</u>, 495 F.2d at 397.

Though the undersigned appreciates the fact that in January 2015 treating oncologist Dr. Kimmey responded to questions from Claimant's attorney with regard to his patient's functioning, the undersigned observes that the questions appear to be contemporaneous with Claimant's allegations in ***January 2015***, and were ***not*** specific to the closed period. (Tr. at 898-902.) As noted *supra*, Claimant testified that Dr. Kimmey did not release Claimant back to school or work until the summer or fall of 2012, and that there is no evidence in the record that rebuts this. Indeed, the

ALJ noted Dr. Kimmey's opinion was given after the requested closed period, and further found that it "relates back at least as far as . . . July 2012." (Tr. at 17.) To the undersigned, this raises a question as to whether Claimant's impairments were severe enough to have significantly affected his capability to perform basic work related activities for at least twelve consecutive months, and this question further presents an evidentiary gap that needs closing. Accordingly, the undersigned **FINDS** the ALJ's determination that Claimant had no severe impairment at step two unsupported by substantial evidence.

The RFC Assessment:

The ALJ did not include the VE's opinion that Claimant was incapable of substantial gainful activity if he would be off task 20% from the workday or miss one or more days every other month due to fatigue, much to Claimant's consternation. Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d). In this case, the ALJ found Claimant did not have a severe impairment at step two of the sequential evaluation process, therefore, he had no duty to proceed to the next step. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Further, hypothetical questions posed to vocational experts need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47,

50 (4th Cir. 1989). As noted *supra*, the ALJ determined that Claimant's alleged limitations were not credible and not supported by the record as a whole. Nevertheless, because the ALJ expressly relied upon Claimant's statements made to a DDS examiner and SSA forms that post-dated the closed period, and further, relied upon Claimant's treating physician's opinion that was rendered almost two years after the closed period, the undersigned cannot find that the ALJ's disregard of the VE's opinion was based on substantial evidence or not. As stated earlier, the conclusion at step two lacks substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for judgment on the pleadings (Document No. 9.), **DENY** the Defendant's request to affirm the decision (Document No. 10.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to determine whether Claimant had a severe impairment that significantly limited his ability to perform basic work related activities for twelve consecutive months during the closed period.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections,

identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 9, 2017.

Omar J. Aboulhosn
United States Magistrate Judge